Good morning, may it please the court. My name is Joel Levine. I represent the appellant, Jose Castellon. I did represent Mr. Castellon at the trial level as well. Just one brief remark about the procedural posture of this case. Both government counsel and the appellant in their briefs have noted that this is a related appeal to that of a co-defendant and a brother of my client. I make that comment because I don't know exactly when that case is going to wind its way to either the three of you or another panel of this court, but typically these things are decided together. Your opening brief almost indicated you're representing both of them. Well, I tried not to do that. If I did, I apologize. No, I just make the comment that you thought the language was like appellant this and you named his brother as an appellant in the briefs, but I suppose you meant you referenced his other appeal. That's correct. And when that other appellant and his counsel submit their matter to the court, it would not surprise me to see a parallel number of issues and perhaps the same issues. So I make that comment to the court in case it has any impact on the three of you in terms of when and how this matter actually will be decided. It may or may not, but I make that comment. Unless there is some preference by the court, I thought I would offer a few brief comments regarding four of the issues that were raised in these appeals and then save a couple of minutes for rebuttal. The first issue that was raised regards a wiretap application, which we have attempted to depict in our briefs as being boilerplate language with respect to the necessity requirement that is one of the requirements of the wiretap statute. One of the things I did last night in preparation for the oral argument was to review that in our brief, we had set forth an argument where we invited this court to look at the necessity arguments as they were depicted in the excerpt of record. And you can open up the paragraphs in those necessity arguments to almost any one of the paragraphs. I did it to one just at random, and I found that the language with respect to the issue I was looking at was exactly the same in each of the arguments. And what that is why — Does that make it insufficient? Do they have to adjust the words so that you can't do that? No, I wouldn't say that. But I think that as this court has noted, or at least a panel of this court has noted in the Blackman case, that is one of the factors when a court evaluates whether or not the government is taking some particular care to really meet the necessity requirement or whether they're just offering some boilerplate excuse, which comes out of a word processor. When you see identical language, you come to the conclusion that either the affiant has a very good memory or the word processor isn't working. And I think in these instances, the latter conclusion is inescapable. Now, that doesn't make it dispositive of the — of issues regarding necessity. But if there is really a necessity requirement, as this court indicated in Blackman, that is one of the factors that a court will consider as to whether or not the government is merely giving lip service to this requirement of Section 2510 or whether there really is such a requirement. And they have to show why they can't do these various necessities. If the circumstances are the same. I'm sorry? If the circumstances are the same. Is it your contention they would have to retype the document? Oh, no, no. That would be a misdemeanor. Are you saying they're lying? I'm saying that they don't care about the requirement. Well, no, that's — they don't care about the requirement. That's fine. But you're saying if they use boilerplate, it's not true? No, I didn't say that. Because apparently, as Judge Silverman says, if the facts are the same and the boilerplate fits both, what difference does it make? Unless you want to change it for each affidavit, you should change a word or two in your word processor, I guess. No, I think that — no, that isn't what I'm saying. What I'm saying is that even if certain facts depicted in an affidavit for a wiretap are true, there is yet this additional requirement that you have to convince a court that in order to move first, and in this case first, to the most intrusive method of law enforcement, you have to satisfy a court that there really is no other way to do this. Then the boilerplate then was too general? It wasn't specific enough? Is that what you're trying to say? One, it isn't specific enough. That's one problem. The second problem is that the fact that it continues to repeat itself shows not only that it wasn't specific enough, but that no care is really being taken. Well, I go back to the lie argument. Then you're saying someone's pushing a button on a computer and doesn't care what the facts are. They're just pushing the button so that they can get an affidavit out. I'm not sure I'm saying it's a lie, but I am saying what you're saying. I'm really not — I'm not ready to go that far. Well, okay. We don't have anything in the record that indicates that, do we? I'm sorry? We don't have anything in the record that indicates that pushing buttons and just putting false things in affidavits. You're just saying it isn't specific enough and it doesn't carry the day. That's right. That's what I'm saying. Unless there are further questions regarding the wiretap issue, let me move on for a moment. One of the other issues that we raised in this appeal — it's not the next one in the brief, but it's the one after that — was that in admitting hearsay testimony on one of the witnesses in the case, the court erred in not adhering to — in the co-conspiracy section to the hearsay rule, not adhering to the requirement that the statements by a co-conspirator made during the course of the conspiracy also have to be in furtherance of the conspiracy. Let me ask you about that. If I understand correctly, the testimony was — the declarant is Julie — the witness was Julie Villarreal. Is that right? Julie Villarreal testifies that her husband, Crow Villarreal, said X, Y, and Z, namely that the defendant was — that her husband told her that your guy was working — that he was working for the defendant. That her husband was working for the defendant. Right. Back in 1996. Right. The government says it's not hearsay, but even if it's hearsay, it's harmless because there was other testimony that Julie said, that your guy said that he was — that Crow was working for him. So this was — it came into evidence anyway as an admission from your client. That's what they say in the red brief, and I didn't see where you refuted in the gray brief. That's what — I think you're correct in one respect, but there's a distinction because there's a timeline problem. What Julie was saying — Julie Villarreal was saying was that when it came to the 1998 facts, there were two series of reports, some that occurred in 1996 with a totally different group of people except for one, and then the 1998 facts. In the 1998 facts, we're not saying that her statements violated the hearsay rule with respect to the infurbiance. There was other evidence to suggest that Crow, Jose, and the various other people were working together. In fact, she actually testified to witnessing some of these events. But when it came to the 1996 events, remember those events were added to the indictment later, in one of the later superseding indictments after she became a cooperating witness. And the distinction with respect to those events is that except for her testimony regarding those 1996 events, there was nothing to link my client to those events. Then she takes the witness stand in the trial, and she's asked questions. Did your husband Crow work in the 1996 — was he convicted and arrested in the 1996 conspiracy? Who was he working for at that time? So she's reporting a prior event. It seems as though the case law requires that in order for that type of a testimony to be admissible, there has to be some objective being furthered with respect to the conspiracy. And there was no showing that that was true. It was merely reporting on a prior event. It was an historical report. And I don't think that the case law that was cited in both the blue and the gray briefs would support that kind of admission. That's a problem. How about the fact that they were distributing this meth continuing on? There's no evidence in the record that your client had withdrawn from the conspiracy or had terminated dealing with these meth operations. Isn't that right? I think you could infer that he was involved over a period of time. Well, you don't infer. You're trying to find out whether or not in this meth operation, which he was heavily involved in, evidence of that, in her testimony, there's nothing in the record that shows that he withdrew at any time from any part of the conspiracy. But there's also nothing in the record to show that he participated in the 1996 portion. It takes very little to show that he continued on in the conspiracy. But, Your Honor, only her testimony that he was in charge of it in 1996 because her husband told her is the evidence that he was involved in the 1996 conspiracy. We asked police officers who investigated that part of the case, was there any reference to him at all? You're arguing there's two conspiracies going on? We attempted to, and we attempted to argue that at one point, that the conspiracies were separate. And the facts, I believe, support that kind of an argument. Don't the indictments allege that the conspiracies, both of them, ended in 98? Yes, they do. Using the question you asked before, that doesn't make it dispositive of whether or not they were separate conspiracies. The fact that the indictment alleges that they were one, a jury can still find that there was more than one. Well, they might, but, I mean, that's their prerogative, and they decide it is against you, you know. That's right. But in terms of whether it's relevant, did the times in question include April 98 and November of 98 as to the conspiracy? That's correct. But, again, at the risk of repeating myself, the only evidence about the 1996 involvement of Jose Castillon came from that testimony. Now, if the testimony was, my husband told me I did it with Jose Castillon back then, and, therefore, you should now do it with me now, because he's such a good boss in the methamphetamine operation, then you probably can admit it, because the testimony would then be in furtherance of the conspiracy. But just to say, back then, my boss was Jose, I think that's just reporting on an historical event. I don't think the case law supports it. The last issue, I was going to talk about the Speedy Trial Act issue, but I don't think I'm going to have the time if I want a couple of minutes. The last issue I will talk about is the expert testimony issue, which I understand, and we've acknowledged in our brief, involves issues of abuse of discretion with respect to the interpretation of those rules of evidence. This was a case, though, that, at least from our perspective, the evidence was almost in its totality the evidence of an expert witness when it came to guilt or innocence issues. Where did the abuse of discretion come in? Tell us what the judge did in admitting, allowing this evidence to come in. What was the abuse of discretion? I don't think that the expert was qualified to give the types of opinions he gave. Specifically what? He gave expert opinion on voice identification. He didn't even know there was an expert in a voice lab at the FBI headquarters in Washington. Does the law require that a person giving voice identification have to be an expert in voice technology? No. I could give expert or non-expert voice identification on a family member whose voice I have heard many, many times. But this gentleman, Mr. Garcia, was hearing these voices on tape recordings. He didn't know these people. Well, he heard the voice, and he identified the voice on the tape recorder as that of the defendant. But he didn't know? And where is the abuse of discretion in letting that in? Is it because he can't do that because he's a lay person? No, no, no. Okay. Where is the abuse of discretion? Because he wasn't familiar with the voices. What does that mean? That means that the first time he was here, for example, if today, let's say, for example, you had never heard my voice, and there's a tape recording of this oral argument, and you listened to that tape recording 200 times tonight, are you qualified to give an expert opinion that that's Joel Levine's voice? I don't think so, Your Honor. And that's what we have here. You're saying because he heard two voices and he didn't know who the voices were, he can't identify them as any particular person. All he can say is they're voices of somebody. Of the same person. Of the same person. That's right, of the same person. And there was even an instance at the trial where this expert was listening to a tape recording of somebody shouting my client's name out loud, as though he were calling him from another room. And he said the person shouting the name was my client. So I may be picking on one or two little instances, but you have a situation where this gentleman was permitted, and when we talk about an abuse of discretion, to be a voice expert, a quantity expert, a guilt or innocence expert. Basically, he ran the trial. And when weren't there, weren't there literally hundreds of recorded conversations that he listened to? Oh, yes. So he he listened and he actually heard the defendant in person. At one point, not on the tape, but he heard him in person. I thought he was there. And I'm not sure about that. He may have heard him once at an interrogation or something like that, an arraignment or an interrogation. No interrogation. But he did say it was a distinctive voice that he had heard hundreds of times on the tape recording. Yes. Is that is that really expert testimony or is that present sense impression? In other words, he he hears this voice hundreds of times on the tape recording. Here's it once in person. So that's the same guy. Is that you have to be an expert to do that? You don't have to be an expert, but I'm not sure that's enough of a foundation. There were five thousand calls, weren't there? Yes. But Jose Castillon was not on that many. How many was he on? I would say maybe 20 or 30. That's my recollection. I could be wrong. Is your is your point that he never met the man in person? Is that the I think that is part of the process where you establish foundation. You know, one of the things that occurred. Well, let's stop right there, because I ask the question that if you had the voice in one genre and another voice somewhere else, that if you didn't know who the voice belonged to, you couldn't identify the person. Judge Nelson said, well, didn't he see him in person here? Now, what is your point? He never saw him in person to identify his voice. Therefore, he can't identify a phantom voice on a tape. That's your point. What's the foundation issue, then? The foundation is that you have to have some degree of familiarity with the person with who you're talking about. That doesn't that doesn't mean anything to me. What do you mean familiarity? That's another test that you're saying he has never seen him and talked to in person to form a foundation that that's this person's voice compared to a phantom voice. Not enough. No, he didn't see him enough. OK. He didn't see your point. So I'm maybe one of the government maybe can fill us in on that point. You know, one of the things I just my last comment on this is one of the things that occurred prior to trial was the judge signed an order that various of the defendants, maybe all of them, give voice exemplars so that somebody could compare them. That never happened. Instead, Mr. Garcia just testified to them. There was no expert that ever was asked to follow up and conduct a comparison of voice exemplars. And we know from our experience that these are the types of things that establish with a greater degree of certainty and a greater degree of foundation that it is really someone who's speaking on a particular conversation. I'd like to reserve some time for rebuttal. All right. Thank you. Good morning. My name is Linda A. Watt and I'm representing the government. I also co-tried the case with Carmen Luege, another AUSA. I'm going to start in reverse order addressing the issues raised by defense counsel because that's fresh in our minds. Could you keep your voice up a little bit? Apparently, we're not getting total amplification or something. Just project out to us, please. I have a very light voice. I'll try to stand closer. This whole voice ID issue is a complete red herring. First of all, Agent Garcia did not testify as an expert regarding voice ID. He testified as a lay witness, as all lay witnesses can, based on his familiarity with the voice of the defendant, Jose Castillo. Tell us the basis. We're talking here, counsel's arguing foundation. Tell us the basis of his testimony. He heard a voice on tapes, right? He heard the wire for a couple of months, heard the voices on the tape. He testified at trial at government's excerpts of record on pages 559 and 500, I'm sorry, 559 and 600, that he became very familiar with the voice, a person who identified himself as Lobster or Big Joe Jose. He then actually met the person and spoke to this person on three separate occasions. What were those occasions? I don't know that he articulated the specific occasions, but I can read the testimony that he, when he identified the voice. The question was, during the wiretap investigation, prior to anyone's arrest, did you become familiar with the voice of a person who identified himself in the conversations as either Joe Lobster or Langosta? Answer, yes, I did. Did the person who identified himself on the wiretap as Joe Lobster or Langosta have the same voice? Yes. After defendant Jose Castillo was arrested, have you had an opportunity to speak with him to hear his voice? Yes. He has a very distinctive, deep in my mind, rough voice. Has the defendant ever spoken to you? Yes. Approximately how many times? Three occasions. And in addition to the times the defendant has spoken to you, have you also heard the defendant speak generally in other circumstances? Yes. Have you, when you first heard the defendant speak after his arrest, did you recognize the voice? Answer, almost immediately, because it's so distinctive. And when you heard the defendant Jose Castillo speak, did you associate the voice of the defendant Jose Castillo with the voice of any person that you heard over the wiretap? Yes. With the person that they called Jose Lobster or Langosta. And then he goes on to identify other voices. But in addition to Agent Garcia's voice identification, we had a cooperating witness whose name was Nick Figueroa, who testified that he was very familiar with Javier and Jose Castillo, had spoken to them on a number of occasions, and also we had him listen to the tapes, and he also identified a number of the co-conspirators' voices, including that of Jose Castillo. His testimony has never been objected to. So besides Agent Garcia's familiarity with Jose Castillo's voice, we had a second person who was very familiar with the voice and testified on that issue. So this whole voice ID thing is a complete red herring. There's ample evidence on the record to establish that Jose was talking on those wiretap tapes. There was cooperating evidence by a co-conspirator. And I'm going to move on to some of the other issues. With regard to the allegations concerning the wiretape-containing boiler point, this is a completely different situation than that in Blackman. Yes, it is true there was duplication of certain aspects of the investigation from wiretap application to wiretap application, because those things didn't change, such as the pen register information. Yes, they used lots and lots of pen register information, but it was not going to dismantle the entire organization. In Blackman, what the court's focus was were the misstatements as to the surveillance allegations and complete inaccuracies as to the informant allegations. In Blackman, the affidavit is a complete duplicate of a prior affidavit used in a related investigation, and the agents stated in the affidavit made statements that led the court to believe that they conducted surveillance against Blackman when, in fact, they had conducted no surveillance. And with regard to informants, the affidavit stated that the cooperating individuals could not provide helpful information to the investigation when, in fact, as the court specified, specific particularities of how the informants could have assisted in that investigation. Here, there were absolutely no misstatements. There have never been any allegations of misstatements or inaccuracies in the affidavit. The affidavits were very specific with regard to each of the informants that had been used and why those informants were not going to be able to dismantle the organization. The affidavits were very specific with regard to particular surveillances that were conducted and articulated specific reasons why those methods were not going to work. In particular, there was a woman in the neighborhood at Javier Castellon's, one of his stash houses, and she was being paid for drugs to do counter-surveillance whenever there was some suspicious activity in the area. And over the wiretaps, we determined that during one of the surveillances, she notified the people at the Baker Street a house, and then Javier was heard on the wiretap saying, shut down, move the drugs. On another occasion, they tried to conduct surveillance of one of the trusted members of the Castellon organization, and he actually videotaped the surveillance by the FBI. So this organization was very savvy to surveillance by law enforcement. And the affidavit goes through each one of the different types of investigation methods that were used and discussed in detail how they were used, if they were used, and if they were not used, why they could not be used. This was a very dangerous and violent organization, as is disclosed in great detail in the affidavit. It was very important to dismantle the entire organization. Unless the Court has any other questions concerning the wiretap, its specificity, or the need for it, or any of the continuances of the wiretap, I'll move on to the next issue that defense raised, which was co-conspirator statements. And that also is a complete red herring. The opening brief, interestingly enough, attacks statements that Villarreal made prior to her husband's arrest in 1996. The reply brief says they attack the statements that she made after the 1996 arrest. In his argument, defense counsel seems confused as to what he's talking about, which he tended to try to confuse the Court in many instances, all of which I could not go into in my brief. I ran out of pages, to be quite frank. But in this particular instance, Villarreal testified that prior to her husband's arrest in 1996, he told her that he was currently engaged in the manufacturing of methamphetamine for the defendant. That statement was made by admitted co-conspirators that never disputed that Villarreal and Crow, her husband, were co-conspirators. It was made in furtherance of the conspiracy because they kept her aware of what was going on. She delivered drugs with her husband for the defendant on occasion, and it also alerted her in the event that if he was arrested, who she should contact, who she should warn. Subsequent to his arrest, he also contacted her and again told her that the defendant, he was manufacturing methamphetamine for the defendant, and she should contact him in connection with having him pay his attorney's fees for bail resources. She contacted him, and he admitted to her that it was because the defendant was working with him and for him in connection with the Garden Grove methamphetamine lab that he was going to pay those attorney's fees. He was going to help her with bail resources. He was going to give her money, and this money was given to keep her quiet. The defendant also paid the attorney's fees for all the other people who were arrested in connection with that lab. This is significant evidence of his guilt in connection with that 1996 lab. Now, so these co-conspirator statements were made, the ones that are attacked were made before. They were made after. Those were not attacked, and they were admitted to by the defendant himself. So clearly these co-conspirator statements were made in furtherance of the conspiracy, and even if they weren't, they're cumulative because the defendant admitted the same thing to Villareal after the 1996 events. I'm sorry, I couldn't hear what you just said. It's cumulative because why? Cumulative because the defendant himself admitted to Villareal that her husband was working for him in connection with the Garden Grove methamphetamine lab, and that's why he was going to pay all the attorney's fees, bail resources, and then keep her going. That's right. I asked Mr. Levine about that, and he said the cumulative part comes in 1998, not 1996. That's why I said this was a very confusing oral argument. I don't understand what he was trying to say with regard to 1998 at all. She testified that in 1996, the defendant admitted to her after her husband was arrested that her husband was working for him at the Garden Grove lab, and that's why he was going to pay his attorney's fees and bail resources and give her additional money, and he did give her additional monies, and she also had conversations with other co-conspirators where she learned that the defendant was paying for the other person's attorney's fees that were arrested on that date. So these conversations occurred before the arrest and after the arrest, but all in 1996. It has nothing to do with 1998. I was completely confused by the oral argument. Well, he's saying that they're two separate conspiracies. He argued that. He never argued in the district court that they were two separate conspiracies. You can pan the record. He never made that argument ever to the jury, to the court. How do we tie 1998 to 1996 as a continuing conspiracy? The conspiracy that was alleged in count one in the indictment started at a time unknown, but certainly we know that it started in 1996 or at least was continuing. There was evidence at trial from Nick Figuerella that back in 1996, I'm sorry, 1995, from 1995 through 1998, he conducted drug transactions with the Castillon organization. So we had evidence that this was one conspiracy that continued from approximately 1995 through 1998 when they were ultimately arrested. Does the conspiracy evidence show that the defendant and his brother were running the lab that furnished the drugs for this conspiracy? The evidence for the 1996 methamphetamine lab, we didn't have any evidence to link Javier with that particular lab, and he was not charged in count two, which is the manufacturing count. With regard to the 1998 wiretap that we have, the evidence showed distinctly that Jose Castillon was operating a methamphetamine lab, and from that lab he was supplying Javier and others with methamphetamine. There's lots of evidence on that. The wiretap conversations were defended himself. Tell us, Javier, we're making that up. How do you tie that lab back to the 1996 operations? The conspiracy to manufacture began in 1996. Jose Castillon was never arrested. He continued to distribute drugs through 1998. The evidence by Nick Figueroa showed that from 1995 through 1998, he was supplying drugs and methamphetamine specifically through the Castillon Organization, and throughout that period of time he was acquiring those drugs whose ultimate source, his understanding, was Jose Castillon. And so the evidence showed that in 1996, Jose Castillon was manufacturing meth. The evidence showed that in 1998, he was manufacturing meth. There's no evidence that shows that that conspiracy ended. There's only evidence to show that it continued. There was never any evidence that he withdrew from the conspiracy or that he stopped making drugs. There was only evidence that the conspiracy continued. Is there any other issues that the Court would like me to address? Could you address the issue with regard to the statements between the appellant and the social worker? Counsel argues that there was error to admit those. That would be my pleasure, Your Honor. This was a very interesting aspect of the trial for me because when we first got the tape, we didn't have an understanding that this woman had never spoken in person with Defendant Jose Castillon. So during our trial prep, we learned that she didn't know, in fact, that this was the defendant talking on the phone. The only evidence that it was him talking on the phone was the fact that he identified himself. And this had to do with the custody of the child, right? Yes. What happened on that tape was the social service worker taped a conversation with someone who identified himself as Jose Castillon, and in that conversation he discussed a custody case, the name of his daughters, and the name of the daughter's mother. Now, that information was interesting to us because in the wiretap calls, there was discussion about Jose during the same time frame, discussion about Jose Castillon being involved in a custody case, the case going against him, and also information about him being at, I forget this woman's name, but this woman's name came up during the wiretap call. But wasn't the surveillance tape referencing Lobster rather than the defendant's name? Which is exactly why we liked this information. In this call, the defendant was arguing that this tape was his client's voice on Exhibit 94. So now they're admitting here's his voice. That's the voice to the social worker. Right, of Jose Castillon. And what we tried to show is that this person identified as Jose Castillon in Exhibit 94, the person they admit is the defendant, is the same person identified as Lobster in the wiretap calls because they're talking about the same things. It didn't matter whether it was truth or not. I don't understand why you get into whether it's true or not. If it comes out of the mouth of the defendant, it's an admission, isn't it? We don't have to get into this kind of hearsay exceptions and whether it's offered for the truth or not. If it's anything out of the defendant's mouth, it's admissible if offered against him. That seemed like a good argument to me, too, Your Honor. I don't know. Maybe we didn't have the room in the brief. I had to actually take out arguments. I'm trying to compute this hearsay. You go into a hearsay exception sort of analysis when it looks to me like if it's from him, it's not hearsay at all. I would agree with you, Your Honor, but the court below felt that we needed to talk about the hearsay aspect of it if there even was one. And so the point is we didn't care whether there actually was a custody hearing. We didn't care whether the mother's name was what he said it was. We didn't care who the daughter was. It was a fact that the Exhibit 94, who they were arguing was the defendant, they were talking about things that were being talked about in the wiretap. And with those two things, we were able to say the person they say is Jose Castellan in Exhibit 94 is Lobster in the wiretap. I guess the defendant is raising the issue that if you rely on the truth that there's a wife and a child custody in one tape with a social worker in a while, a wife and child custody in the other, that you're talking about the truth of those statements, I guess. We didn't care if they were true or not. He could have said the moon is made of cheese in Exhibit 94. And if they said the moon was made of cheese and the wiretap calls, we had our connection. It didn't matter. It's just a statement. Two statements connecting the two is what you're saying. Exactly. Same statements. Exactly. Exactly. Are there any issues the court would like me to address? I guess not. Thank you. Thank you. Oddly enough, in that tape, which we did contend was his voice, he also said he was in Mexico at the time, which would have been contrary to anything that the government was alleging. And it would have been very convenient if they would have attempted to match his voice through some scientific basis to the voice on the wiretap. How can it possibly be hearsay if it's your guy's voice and you admit it's your guy's voice and it's offered by the government against him for any purpose? How can it be hearsay at all? Well, it has to be one of the exceptions to the hearsay. No, it's an admission. And by definition, an admission is not hearsay. An admission of what, though? An admission of whatever. It doesn't matter. It's offered against him. Well, I think it has to be an admission against interest. Isn't that right? No, that's not right. No, that's not right. Anything that he says that's offered against him is an admission for whatever purpose the government can use. It's an admission against his interest. That's a declaration against interest, I think we're talking. Okay. But you acknowledge it was his voice on tape. Well, he argued it was his voice. And it's true that it was offered against him by the government, this other portion of the tape. Yes. Yes. But I'm not sure. I don't draw the connection that Your Honor is drawing. I think it still has to be something which is offered, which is an admission against his interest. You dragged in the hearsay because I think you tried to relate to trying to offer the truth of the custody item, the child and the mother. That was the, that's right. Yeah, okay. I understand your position. One of the things I think I heard during the government argument here this morning is that when it came to the in furtherance issue, that in 1996, the defendant, Jose Castillon, told Julie Villarreal he was paying for the bail because he was the boss of the 1996 operation. I think I heard that this morning. There was no such testimony. He did tell Julie Villarreal he would, after her husband got arrested, that he would help with some expenses and help the husband get bail. But he never, to my knowledge, said in the record, or I didn't see any testimony, where he said the reason why I'm doing this is because I was his boss in a methamphetamine operation. So I'm asking the court not to draw that conclusion unless you find it in the record and I'm incorrect. Next, and I'm getting down to the wire here. On the wiretap itself, one of the arguments I heard this morning was that the defense had never objected to the accuracy or truthfulness of statements that were made in the wiretap. We did, in the lower court, as part of the wiretap suppression motions, ask for a Franks v. Delaware hearing. So even though we did not raise that in terms of the issue of brief and disappeal, it was something that we did ask for below. And so I just wanted to correct the record. All right. Thank you. Thank you. Case just argued will be submitted.
judges: Brunetti, Tg Nelson, Silverman